07-1059, Mr. Dinger Thank you, Your Honor. I am pleased to report with me is my partner, Francis Lynch. This is a case, Your Honors, where a patent claim to an enantiomer is challenged over prior art disclosing the corresponding racemate. Typically, in these cases, the major fight is a structural obviousness case. The close structural similarity between a racemate and its enantiomers typically establishes prima facie obviousness of the enantiomers, and then the fight turns on secondary considerations such as unexpected results. But this case is unusual because here we have a prior art publication that expressly discloses the enantiomers of the prior art drug citalopram and discloses them as separate pure compounds. And so the thrust of my argument this afternoon will be… How does it expressly disclose separate pure compounds? What I see, correct me if I'm wrong, is it mentions citalopram, states that it's racemic, and then it predicts, without telling how to make the R or the S, that the R is more potent than the S, which I think is factually incorrect. So how is there an anticipation here? There's an anticipation argument because the Smith reference and the pertinent passage is this. It is also of interest to mention citalopram, which is a racemic drug. But it goes on to disclose not only the racemate. So the effect of the individual enantiomers of citalopram had never been studied. The model predicts that there would be one largely inactive and one active enantiomer. That, to a person of skill in the art, discloses both enantiomers. It discloses them. Is it enabling? It is because under the facts, I suggest, Your Honor, a person of ordinary skill in the art would be able to make either enantiomer without undue experimentation. It is not necessary. This Court has made it very clear. It is not necessary for the prior art publication itself to spell it out. Indeed, there have been cases where the prior art publication has not had any instructions, any recipe on how to make it. So long as the person— Isn't it shown on the record that it wasn't so easy to separate the racemic mixture? In fact, didn't Mr. Smith, or Dr. Smith himself, said he didn't see how it could be done? Mr. Smith may not have known how to do it, but the evidence, I suggest, was clear and largely undisputed that a person of ordinary skill in the art would clearly know the steps to resolve the citalopram into its enantiomers by forming diastereomeric salts. Let me review what was in the prior art and what the experts agree a person of ordinary skill in the art would know. The person of skill would, first of all, know of citalopram. They would, second, know of the diol and the relationship between the diol and citalopram, the method of making the citalopram from the diol was disclosed in the 884 patent. The technique in general of resolving racemates using the formation of diastereomeric salts was one that both experts acknowledged was familiar to a student of organic chemistry. It is, the forest expert said, the mother's milk of chemists, to the typical medicinal chemist, and it would be the technique that a person of skill would ordinary turn to first. Moreover, a person of skill in the art, and again there is no disagreement, would know how to take a racemate with an amine group, as both the citalopram and the diol had, and use a carboxylic acid such as tartaric acid to form diastereomeric salts. That was disclosed in the Willen publication, and there is no dispute that a person of skill in the art would know how to do that, would recognize its applicability to the kind of compounds we're talking about here, and would have an expectation of success. Aren't all these facts, having been decided by the district court to whom we owe some deference? So aren't you talking about a clearly erroneous standard? Well, if it were facts that we were talking about, yes, it would be a clearly erroneous standard. But I suggest that what Judge Farnon was focused on was not the facts that are material to enablement, but to a question of motivation. The expert testimony— Motivation. Excuse me? Motivation. Motivation? We've heard of that. Recently, I think. But for purposes of anticipation, and for purposes of enablement, the point is that motivation is not relevant. So long as the person of ordinary skill in the art had the tools, and I suggest there was no dispute on this record, that the tools were available. The starting materials and the well-established, long-established techniques applicable to materials of the sort we're dealing with here were known in the prior art. What the judge found, in reliance on the testimony of Dr. Daniszewski, was that a person of skill in the art, even though they may have known what to do, wouldn't have done it. For one reason or another, it might have been a preference for dealing specifically with the racemate and not turning to the diet. It might have been a perception that the chemical transformation was very difficult, so they would not have bothered to do it. But I suggest for purposes of an anticipation argument, that's irrelevant. I think the case law of this court is quite clear, that even an allegedly anticipating prior art publication can teach away from what it is said to anticipate and still anticipate. The question is whether or not a patentee can remove a compound that has been disclosed in the prior art more than a year before the patent application, because of a claim that it would be difficult for a person of skill in the art to make it. Where is the S plus disclosed in Smith? I beg your pardon, Your Honor? Where is the S plus enantiomer disclosed in Smith? It's referenced in the last paragraph of the article. It refers to both. It refers to both the R and the S enantiomer, and that is a sufficient disclosure. The question of whether or not a person of skill in the art could make it, I suggest, is different. It doesn't have to be found in the Smith reference itself. Are you referring to 7103? Is that where it would be, 7103, the appendix? Yes, 7103. That's right. The other point, returning to the enablement argument, in addition to the motivational concerns, which I suggest are simply not relevant as a matter of law. The judge relied on the experience of Dr. Bogazzo, and primarily Dr. Bogazzo, who said that whatever the testimony is regarding what a person of ordinary skill in the art would know and do, these guys are pretty smart, and they had a tough time resolving Satalibre. I'm paraphrasing Judge Fardy, but he said basically that trumps the expert testimony that was largely not in dispute about what a person of ordinary skill in the art would know and do. But the problem with the experience of Dr. Bogazzo is that, in fact, it doesn't show that it was hard. At least the process that we've identified of using diastereomeric salts, the evidence was there were 14 corroborated attempts to resolve Satalibre itself that were unsuccessful, and then when Dr. Bogazzo turned to the diol, he was successful on the first try. But weren't there concerns about using the diol that it would re-racemize? There was a concern. I mean there was testimony that if one simply practiced the method disclosed in the 884 patent using a strong acid in the last step, you would run a risk of re-racemization. But the evidence was also not disputed from the experts on both sides that a person of ordinary skill in the art would know better, would know that you would need to use a base in the cyclization step, and would know not to follow without that change the process in the 884 patent. Haven't you just argued against yourself when you said there were 14 unsuccessful tries? No, because they were all routine, your honor. I mean, I go back to the point that trying to... Supposedly routine. In other words, what you just described as what every student of organic chemistry knows wasn't so easy in the actuality. Well, I think the tests themselves were routine. They did not result, when Dr. Borghese started with citalofram itself, he did not succeed in forming the crystals that are needed to achieve the separation. But he also testified that he certainly knew of the diol, he invented the diol. He said he thought about using it for a long time, and then when he did use the diol, as a person of skill in the art with knowledge of the diol would do, he was successful. I suggest that's not a sign of undue experimentation, even if Dr. Borghese was a person of ordinary skill in the art, and he certainly was not. So, I view that evidence as consistent with the person of ordinary skill in the art being fully able to practice this play. I'm into my rebuttal, if I can reserve the rest. We will save it for you. Thank you. Mr. DeMarais. Thank you, your honor. Good afternoon. May it please the court. Let me start by saying that we shouldn't lose sight of the facts in this case. Even under the KSR decision, they tell us to look at the facts and use our common sense. The invention in this case saves lives. Lexapro, which is an enantiomer, cures patients of depression and prevents them from committing suicide, above and beyond what the racemate did that came before. But if it were disclosed in Smith, and if the enablement needn't have been shown in Smith, but elsewhere within the skill of the art, that's irrelevant. I mean, that's the determinant of the legal issue, isn't it? Oh, absolutely, your honor. It is irrelevant if Lexapro saves lives if it is anticipated, but I'm going to get to that. That's clearly not, and the undisputed record, which I'm about to go into, shows eight years of failed experiments by people at the height of this profession. Let's start with the invention story here, because I think if we look again, focus on the facts and what actually happened. You're not talking to a jury. I'm going to give you the appellate science here. Klaus Bogusow was a Ph.D. chemist. He already had a blockbuster drug, so this man was at the height of skill in the art. When he decided to try to make the enantiomer, he went, as counsel said, to one of the first things people do, which is try to separate it by making diastereomeric salts. It failed repeatedly. He tried it with dibenzyl tartaric acid. He tried it with camphor sulfonic acid. He tried it with mandelic acid. He tried it with ditol tartaric acid. He then changed the conditions, and this is all in his lab notebooks. It was all proof to trial. He changed the conditions. He tried to get it to crystallize. It didn't work. Why didn't he try the diol? The current state of the art at the time was that the diol would re-racemalize if you had separated and tried to get to citalopram because the 884 patent, which Dr. Bogusow was the inventor on, the reaction there was a re-racemalization. Even Dr. Trost, the appellant's expert, admitted that the prior art that he relied on would have re-racemalized. But even more interesting, actually, and this runs directly counter to their argument, they're relying on the Willen reference to show that you could have separated. You could have used diastereomeric salts. Your argument, as I understand, this is an argument directed to the obviousness point or to the anticipation? This, what I'm about to talk to, goes to both because it goes to inanimate and to obvious. Well, what you've been saying so far about the attempts over a period of time to do this, that relates to the obviousness rather than anticipation. It actually goes to both because Smith doesn't tell us how to make the enantiomer. They're relying on what people skilled in the art know about how to make the enantiomer, and I'm showing you real-world examples of Dr. Bogusow trying and failing. So it actually goes directly to is Smith enabling, where people skilled in the art are able to do it, and it goes to obviousness. But their argument is that Willen is their key reference, and Willen, they say, would tell a person skilled in the art that you could dissolve the diol. But if you actually look at what happened here, Willen tells you with an amine, use tartaric acid. Citalopram is amine. It's a tertiary amine. Klaus Bogusow used tartaric acid, and it didn't separate the enantiomers of citalopram. It didn't work. So even if you go back one step to the diol, the diol has the same tertiary amine. So if you're a person skilled in the art, and you've just tried to dissolve citalopram, which is a tertiary amine, using Willen as they're telling you somebody would have done, you would be actually taught away from using Willen for the diol, because it's the same tertiary amine, and it's already failed at the main compound. What you really would do if you were reading Willen and following its teaching, and this was proved to try, the diol has alcohols, and you would use the resolving agents in Willen for alcohols, and they don't work. So to go back now and say the method that worked is combining Willen with Jacobus, and to mix and match, is actually contrary to what actually happened in this case. What actually happened in this case is Klaus Bogusow did do the diastereomeric salts. Every single attempt failed, and he did hundreds of them, not 14, he did hundreds of them. Then what he did after that is he tried derivatives of citalopram. Again, with all of those acids, every single one of them failed. And he was at the top of the field. But then what they did, it doesn't even stop there. They went to the top experts in the field to try to get these drugs separated. They had Klaus Gunderthoff, one of the other scientists at Lundbeck, study HPLC efforts, which were coming on the market at the time, and he tried to resolve it through HPLC. It didn't work. They sent citalopram to the Royal Danish School of Pharmacy, and tried to get the top scientists in Denmark to separate it. They couldn't get it separated. Dr. Smith, the author of the prior art reference, took citalopram to the lab of Dr. Purple, the man who invented HPLC, and they, too, tried to separate it, and they failed. Eight years of failed efforts. Even if we accept what you have to say, doesn't it all go down the drain because of a broadened reissue beyond two years? No, and here's why. There are two sets of claims in the case, obviously. The composition claims and the methadone use claims are not related. That applies to claim 11. Is that correct? The broadened reissue is only claim 11, if you call it a broadened reissue. But let's address that. So that doesn't affect the rest of the claim. It has nothing to do with the rest of the pack. It only affects claim 11, claims 1, 3, 5, 7, and 9, which are composition and methadone use in patients. Nothing to do with the reissue. The reissue was only claim 11. Why were they arguing it then? He can tell me in a moment. Excuse me? Why were they arguing about the broadened reissue? Oh, they were found to infringe claim 11 as well. Yeah, in claim 11, the only thing that was changed in the reissue was the sign of the dial, whether it was the plus mantor or the minus mantor. And the evidence was both sides' experts agreed that if you read the specification, you would know that it was supposed to be the reverse sign. Example 2. Do you claim that's a clerical error in effect? It was our position at the trial that it was a type of clerical error. Well, then my question to you is, if that's all it was, why didn't you proceed under section 251 to correct the error? Why did you seek a reissue? The reissue was not based on that alone. There were other things that were being corrected in the process. So there was a statement in the specification that was taken out, and there were other changes to the patent that were being made. So as part of the entire reissue process, this change was made as well. Probably another alternative, it could have been done under 255, but there's no prohibition to doing it under 251. In fact, 251 says if you want to change something that's inoperative. Except 251 doesn't have the two-year limitation period. Certainly, right. Certainly there is a difference in that regard, but that two-year limitation only implies that it's broadening. And I think the case law from this court is pretty clear that if a person of skill in the art reading that claim would understand that it was supposed to be a plus or a minus, then it's not a broadening. Because a proper—you should look at it this way, in my view. When you're doing the markment on that claim, you're going to give that claim the interpretation of what a person skilled in the art reading that claim would say that claim means. And example two was clear. It's not just example two. Example two is crystal clear. Reaction scheme two is crystal clear. And their expert agreed, too. This is not just advocacy. Our expert agreed and their expert agreed. The only reason their expert in trial came out differently, he started with the claim. We agree with you on anticipation and obviousness. Is it your view we don't have to deal with the broadening issue question of claim 11? Not entirely, no. Because if they were infringing the process claim, they're obviously infringing claim 1, the product claim. It wouldn't change the ultimate result in the sense that they would be enjoined. If that's what your question is, yes. You are right in that regard. The only reason I said no is because claim 11 is still an infringed claim. But you're right. It ultimately wouldn't change the result, which is they wouldn't be coming out of market. There would still be an injunction that they wouldn't be coming out of market. Would you call it moot? If claim 11 is invalid, that, I presume, would change the scope of the injunction. Since the injunction now is only against the process and not against the sale of the product. If all claims other than claim 11 are upheld, but claim 11 is invalidated, wouldn't that lead to perhaps a change? No, I guess not. No, it's the reverse, actually. Because all the other claims are the product and using the drug. So if you invalidate claim 11, it wouldn't affect the scope of the injunction, in my view. But claim 11 is important to other issues for the parties, in the sense that CIPLA, one of the defendants here, is a manufacturer. And they are, in fact, using example 2 for the patent and claim 11. And they may supply other generics. Abroad. It's a 271G issue? That's right. And they are not just the supplier to IVACS and TEVA. They can supply any generics. So claim 11 is an important claim. And it actually builds. It's one of the secondary considerations here, actually, because it's another indication of a secondary indication of non-obvious. Because they copied not only the drug, but they copied the way we make it in example 2. And they copied the process we use in claim 11. But getting back to the obviousness and anticipation. So enablement and obviousness. In addition to everybody failing with all these experiments over eight years, it's interesting, even the defendant's own conduct in this case essentially proves our point about this being undue experimentation. Because at trial, they pursued an entirely different theory. Their theory at trial, and their expert chemists testified to this, that people would first start with chromatography, high-pressure chromatography, to get this resolution. And then we proved at trial through cross-examination that that was a failed attempt. So now on appeal, they've totally changed yet again what they say everybody would do. You don't challenge Mr. Dinger's view that one doesn't have to find enablement in the reference which describes the compound? I don't challenge that. I do believe that the current state of the law is— But it's your view that it wasn't achievable readily without undue experimentation. Exactly. And I think that if we look again at the real-world evidence, and we use common sense like this court's precedent and the recent Supreme Court case both tell us to do, I don't see how we can come to any other conclusion when you look at what people really did, how many failed experiments there were. And it's not the case— Are these all fact findings? Every single one of them is in a detailed opinion by the district court. They are findings of fact after a trial, not on summary judgment, after a trial where the judge decided credibility. He actually decided in the opinion which expert he was going to believe based on credibility, and he made factual determinations. So it's got to be clear error or abuse of discretion, and there's no way on this record that I see us getting there. And I want to pick up on one point that the appellant said, which is the dial was a simple thing to do even if you get there. If you look at the trial record, even if you get beyond the diastereomeric salts and all the experiments that failed and all the chromatography experiments that failed, even when they went to the syntheses, the asymmetric syntheses they called it, they had several failed asymmetric syntheses before they even got to the one that worked. So even when they went to that synthetic chemistry, Klaus Bogusow testified that he and Jens Perger, his companion and co-inventor in the lab at Lundbeck, failed several times with the asymmetric syntheses. So then when you look at beyond how hard it was to do, and then you start looking at the unexpected results, again, which is findings of fact that the district court made, Lexapro has a higher probability of helping patients. The S enantiomer, the plus enantiomer, is 100 times more potent than the opposite enantiomer. Nobody expected that. But it's twice the activity of the racemate. It takes half the dose, but it's 100 times more potent than the other enantiomer because the other enantiomer actually inhibits. This was a new finding that people had totally not expected. More importantly, it has a faster onset of action. It has efficacy in severely depressed patients that other depressants don't have. And it helps people. Here's a very key point. It helps people that selects it. You're saying that even if it's obvious on the basis if we accept Mr. Dinger's argument that it's obvious how to obtain the enantiomer, it has unexpected properties. I'm saying even if he can come forward with a prima facie case of structural obviousness, then it is relevant that it was hard to make and that there were unexpected properties. And that's why I'm telling you about the unexpected properties. You've got a third line of defense. It's a third line of defense. And I think here's a key point, real world facts that show the unexpected properties. Lexapro was the last drug to come to SSRI market. It was the sixth entrant. In there were blockbusters by Pfizer, Glaxo, Sanofi, all the huge drug companies. And here comes Forrest, a small company, sixth entrant to the market. Already the racement was on the market as a generic. So they say there's no difference between the enantiomer and the racement. The racement is already on the market as a generic. And yet, coming in last to the market, it is now the highest selling drug in the market. The most prescribed, $2 billion a year as the last entrant. If that is not a superior product of unexpected results, I don't know what is. Thank you, Mr. Desmarais. Mr. Dinger has some time left, almost five minutes. Thank you, Your Honor. Let me first touch briefly on the question of unexpected results. We argue in our brief, and I'm not going to elaborate on it, that the evidence for unexpected results was equivocal and inconsistent. But what is clear as a matter of law is, as this court or as its predecessor has— Then how did it get to be such a big selling drug? Well, because it was the most massively marketed drug almost in the history of pharmaceutics. Forrest got an award from some industry group because of the extraordinary success of its marketing campaign, converting the market from Lexapro—I'm sorry, from Celexa, its racemic product, to Lexapro. But doesn't it have to work and be that successful? Nobody's questioning that it works. Superior. I mean, if it's a generic on the market, this is presumably much higher priced, and so people are continuing to prescribe it. They are continuing to prescribe it. There's no question that it is a successful drug. But as a matter of law, the evidence of commercial success here is irrelevant. That is the thrust of the Merck v. Teva case decided by this court, because commercial success is ordinarily relevant because it would provide an incentive for competitors to come onto the marketplace earlier. They couldn't do it here because of the patent on the racemic drug that kept people from competing with Forrest with the enantiomer drug. So as a matter of law, the success is irrelevant, but we think that the evidence was clear that it was an extraordinary marketing campaign on the part of Forrest that resulted in the success that it enjoyed. How long has this drug been on the market now? Lexapro? I'm not entirely sure. Let me also mention another legal issue, which is the burden of proof on the issue of enablement. This court in the Amgen case ruled that prior art is presumed enabling. Now, they were talking about a prior art patent, although not simply what is claimed. The specification was ruled in Amgen to be enabling as well. The court in Amgen also noted that it was a logical extension, given the rationale articulated in Amgen, that any prior art publication is presumed to be enabling. The rationale, I suggest, is that— Is it presumed to be enabling if it's merely mentioned in a medical paper, or is it only presumed to be enabling if there's a purported process in a chemical paper? In both cases, it's presumed to be enabling because the reason it's presumed to be enabling is that if someone comes along and wants to take a product or a drug that is already disclosed, is already identified in the public domain, and say, no, it's not available to the public, they ought to have the burden of removing it from the public by showing that persons would not be able to make it. And that's, I suggest, that's the rationale, I think, that the court adopted in Amgen. It was not based on the presumption of the validity of a patent. Now, on the diol, Mr. de Marais said that by practicing Willen on citalopram itself, even though citalopram had an amine, it didn't work, and that was correct. However, Dr. Trost testified, without contradiction, that a person of ordinary skill of the art would have recognized that because the diol had more functional groups near the chiral center of the molecule, it was more likely to be susceptible to crystallization using the teachings of Willen. And again, there was no dispute in the record that this is knowledge that a person of ordinary skill in the art would have. Mr. de Marais referred to the hundreds of experiments that Dr. Bobezo undertook. Well, it wasn't hundreds dealing with the diastereomeric salts. There were a whole lot of other things that he did. Moreover, a lot of those experiments occurred before the 884 patent disclosed the diol. Moreover, the kind of experiments that are relevant here, there are only 14 recorded, that is, corroborated experiments here, and those are the only ones that I suggest are relevant, and there is still no dispute that once he turned to the diol, and both experts recognized that once he concluded that it wasn't going to work with citalopramine, he would turn to the diol, it worked the first time. I have no more time. Thank you. Thank you, Mr. Dinger. We have a case. We'll take it under advisement, and we will attempt to resolve it. Thank you. All rise. I would like to call the witnesses to the panel.